UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF FLORIDA

ORLANDO DIVISION

| | |
|---|---|
| SECURE MI VOTE COMMITTEE, LIBERTY INITIATIVE FUND, | Case No. |
| Plaintiffs, | **COMPLAINT** |
| v. | |
| LET THE VOTERS DECIDE, LLC, | |
| Defendant. | |

Plaintiffs Secure MI Vote Committee ("Secure") and the Liberty

Initiative Fund ("Liberty" and, collectively with Secure, "Plaintiffs"), by and

through their undersigned counsel, bring this action for trebled compensatory

damages, declaratory, and injunctive relief under the antitrust laws of the

United States, and for similar relief under state law, against Defendant Let

the Voters Decide, LLC ("LTVD"), alleging as follows:

**NATURE OF THE CASE**

1.      In 2022, Defendant LTVD and its principal, Mark Jacoby,

organized and enforced a series of unlawful group boycotts involving LTVD

and its competitors to foreclose Plaintiff Secure from access to petition drive

management and signature gathering services that Secure needed so it could

gather enough signatures to qualify a ballot measure for the 2022 election.

These boycotts succeeded in derailing Secure's efforts to qualify its ballot

measure for the 2022 election, while substantially inflating the price that it had to pay for the petition drive management and signature gathering services it used in its unsuccessful petition drive.

2.     Plaintiff Secure is a nonprofit that sought to put before Michigan voters in the 2022 election a ballot question that would, if passed, have enacted commonsense election law reforms applicable to future elections in Michigan. The measure primarily would have required that voters show identification. Plaintiff Liberty Initiative Fund is a nonprofit that, among other things, supports voter identification initiatives around the country and aided Secure by, among other things, paying directly for some of the costs of its petition drive.

3.     But Michigan voters never got the chance to decide for themselves whether they favored the reforms that Plaintiffs advocated. Instead, the ironically named Let the Voters Decide, acting as the paid enforcer for a cabal of left-wing operatives, acted unlawfully to deny Michigan voters the opportunity to decide that question by sabotaging Secure's efforts to collect the petition signatures required to qualify the ballot question for the election.

4.     Central to that unethical scheme was a series of antitrust violations committed by LTVD—which, despite normally working on Republican or right-of-center political efforts, agreed in this instance to act as

the cabal's paid enforcer—for which Plaintiffs now seek redress.  Specifically, LTVD—which is in the business of providing (a) petition drive management ("PDM") and (b) signature gathering services to entities seeking to qualify ballot questions—entered into a series of unlawful, bilateral contracts, combinations, or conspiracies in restraint of trade with all or sufficiently all of its competitors (both competing or potentially competing providers of PDM services and competing or potentially competing providers of signature gathering services) to prevent Secure from getting the signatures it needed to get its measure on the ballot by the deadline for the 2022 election at a competitive cost.  Specifically, LTVD coerced, bribed, harassed, intimidated, and cajoled (a) other providers of PDM services, and (b) other signature gatherers to enter into a series of bilateral agreements to refuse to provide necessary services to Secure, which had the purpose and effect of foreclosing Secure from access to necessary resources. As a result, Plaintiffs paid substantially more for those services, when they were able to obtain them, than they would have in a market unaffected by LTVD's anticompetitive actions.

5.      To get its proposed question on the ballot for 2022, Secure needed to reach a certain threshold of valid petition signatures by June 1, 2022. Because LTVD's unlawful conduct denied Secure access to the PDM and signature gathering services it needed to meet that deadline, however, Secure

was unable to meet that threshold by that deadline.  As a result, Secure was forced to redirect its efforts to an attempt to qualify its petition for the 2024 election, for which it timely submitted the requisite number of signatures (plus extra signatures to provide a safety margin to guard against invalidation of signatures), to the State Board of Canvassers.  As a result of LTVD's unlawful actions, not only was the petition drive delayed beyond the deadline for the 2022 ballot, but also the price paid for the petition drive was substantially increased.

6.      Absent LTVD's unlawful and anticompetitive conduct, Secure's proposed ballot measure would have amassed the petition signatures required to qualify for the 2022 election (or the 2024 election) at a substantially lower cost.  In short, LTVD's conduct increased the prices paid by Plaintiffs for PDM services and signature gathering services, and reduced the quality of the services Plaintiffs received by preventing Secure from meeting the deadline for the 2022 ballot.

7.      Secure brings this lawsuit pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, and pursuant to state law, to recover trebled compensatory damages suffered by Secure and its costs of suit, including reasonable attorney's fees; for declaratory and injunctive relief; and for such other relief as is afforded under the antitrust laws of the United

States for Defendant's serial violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and under state law.

## PARTIES

8.      Plaintiff Secure is a ballot question committee seeking to restore faith in the Michigan election process by advocating for election laws that make it easier to vote but harder to cheat.  It is an unincorporated association with its principal place of business at 106 W. Allegan, Suite 200, Lansing, MI 48933.  All of its members are citizens of and domiciled in Michigan.

9.      Plaintiff Liberty is a 501(c)(4) nonprofit organization whose mission is to rally Americans to restore greater citizen control of government by assisting citizens in using the initiative or referendum or recall process to increase our liberty, especially by placing measures on state and local ballots. Liberty is a Virginia corporation with its principal place of business at 4491 Cheshire Station Plaza, Suite 176, Woodbridge, VA 22193-2226.

10.     Defendant LTVD is a limited liability company organized under the laws of Florida, with its principal place of business at 52 Riley Road, #305, Celebration, FL 34747.

11.     LTVD is in the business of providing PDM services and signature gathering services to, among others, entities seeking to gather signatures needed to qualify ballot measures. By providing those services, LTVD, in its

own words, "helps potential candidates, concerned citizens and political action groups get themselves, or the issues that matter most to them, on the ballot."

12.    LTVD and its principal, Mark Jacoby, have a long history of working to gather signatures for Republican candidates and right-of-center political campaigns, including throughout 2022 in various states across the nation.  Among other things, in 2022 it provided part of the labor force that succeeded in gathering the signatures needed to qualify Nebraska Initiative 432, a measure that imposed voter ID requirements in Nebraska, for the ballot in that state.

## JURISDICTION, STANDING, AND VENUE

13.    Plaintiffs bring this action to recover damages, including treble damages, cost of suit, and reasonable attorney's fees, as well as declaratory and injunctive relief, arising from LTVD's violations of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.

14.    This Court has subject matter jurisdiction of the Plaintiffs' federal law claims pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1337 (commerce and antitrust regulation).

15.    This Court also has diversity jurisdiction pursuant to 28 U.S.C. § 1332(a), as the parties are citizens of different states and the amount in controversy, exclusive of interest and costs, exceeds $75,000.

16.     Plaintiffs have standing to bring this action under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26.

17.     This Court has subject matter jurisdiction of the Plaintiffs' pendent state law claims pursuant to 28 U.S.C. § 1367. Each of the Plaintiffs' state law claims arises out of the same factual nucleus as the Plaintiffs' federal law claims.

18.     This Court has personal jurisdiction over Defendant and venue is proper in the Middle District of Florida and in this division under Sections 4 and 12 of the Clayton Act, 15 U.S.C. §§ 15, 22, and 28 U.S.C. § 1391, because Defendant has its principal place of business in this district and division from which it formulated, led, and joined multiple bilateral conspiracies, contracts, and combinations in restraint of trade with its competitors, and also under Florida's long-arm statutes, Fla. Statute 48.193(1)(a)(1) – (2).

19.     Defendant is engaged in, and its activities substantially affect, interstate trade and commerce.  It conducts signature gathering drives across the nation and generates millions of dollars in revenue from doing so.

**THE MICHIGAN PETITION PROCESS**

20.     Citizens of Michigan may initiate legislation as either an indirectly initiated state statute or a directly initiated constitutional amendment. For statutes, if the petition receives enough valid signatures, the state legislature then has 40 days to adopt or reject the proposal. If the

7

legislature rejects the law, then the measure is placed on the next general election ballot. For amendments, if the petition contains sufficient signatures, then the measure is placed directly on the next general election ballot. *See* Mich. Const. 1963, art. 2, § 9.

21.    The process is as follows:  First, a copy of the petition to change laws or amend the constitution is submitted to the Michigan Secretary of State. Second, signatures in favor of the petition must be gathered in a certain amount and by a specified date.

22.    Petitioners for new laws in 2022 were required to submit 340,047 valid signatures by June 1, 2022. *See* Mich. Const. 1963, art 2, § 9.[1]  To be valid, a signature must be submitted within 180 days of when it was gathered.

23.    By September 9, 2022, Michigan's Board of State Canvassers was required to validate signatures for each petition that was timely submitted by the June 1 deadline.

---

[1] "To invoke the initiative or referendum, petitions signed by a number of registered electors, not less than eight percent for initiative and five percent for referendum of the total vote cast for all candidates for governor at the last preceding general election at which a governor was elected shall be required." Mich. Const. 1963, art 2, § 9.

24.     Petitions with sufficient validated signatures then go to the Michigan legislature, which may adopt or reject the new law. A new law adopted through this means is not subject to a governor's veto.

25.     If the legislature rejects the proposed new law, then the new law would go on the ballot at the next general election.

26.     In the 2022 election cycle, because both houses of the Michigan legislature had Republican majorities, it was reasonably expected that, had Secure succeeded in collecting sufficient signatures, the legislature would have enacted its ballot question into law, with no ability by the governor to veto it.

**THE PETITION DRIVE SUPPORT INDUSTRY**

27.     Ballot measure sponsors, or petitioners, seek to collect at least the required number of valid signatures within the required timeframe for a measure to be included on a state ballot. (Typically, they seek to gather substantially more signatures than the minimum required to provide a safety margin that would account for invalidation of some of the gathered signatures.)  This effort is referred to herein as a "petition drive."  To do so, they typically hire professionals to provide PDM services and signature gathering services.  Those running a petition drive may retain a single company (typically a PDM service provider) to provide both sets of services—

frequently through the use of subcontractors to provide the signature gathering services—or may contract for each separately.

28.    Providers of PDM services offer a bundle of supervisory and advisory services necessary to run a petition drive, which may include such services as the provision of strategic and tactical advice; the hiring, management, and supervision of the actual signature gatherers; and the validation of collected signatures.

29.    Many providers of PDM services are associated with either the political "left" or "right," and are not willing to work on ballot measures strongly associated with the other side. (Defendant LTVD is not such a politically motivated entity; it works for campaigns and signature drives on both sides of the aisle and has a long history of working on Republican and other right-of-center signature gathering drives, including in 2022.)  This has the effect of limiting the pool of PDM service providers available to those seeking to qualify certain politically charged ballot measures.

30.    Because PDM service providers often provide tactical and strategic advice that shapes a given petition drive (e.g., where to allocate scarce resources to maximize the number of signatures gathered), those with experience in prior drives in a particular jurisdiction are much preferred over those without such a local track record.

31.     PDM service provision is a word-of-mouth industry, in which customers tend to work with providers with whom they have prior experience or who have strong recommendations from a trustworthy source.

32.     In addition to PDM services, a signature gathering drive requires individuals known as "signature gatherers" or "circulators" to actually collect signatures from voters.[2]

33.     Circulators are typically independent contractors who can and do work with various PDM companies.  Professional signature gatherers are typically itinerant workers who may travel from state to state, depending on the availability of work in a particular election cycle.

34.     As independent contractors they can and often do work for multiple employers, either simultaneously or sequentially, depending on the availability of work, although many have established relationships with particular companies that specialize in providing a workforce of signature gatherers for petition drives.  Because they are usually paid by the signature, in states where multiple signature gathering campaigns are occurring, professional signature gatherers typically collect signatures for multiple clients simultaneously.

---

[2] "A petition circulator, also referred to as a 'circulator,' 'signature gatherer,' or 'signature collector,' is a campaign worker who asks voters to sign a petition to place a ballot initiative, referendum, recall, or candidate on the ballot. Such workers may be volunteers or paid professionals." https://ballotpedia.org/Petition_circulator.

11

35.     Subcontracting is a frequent practice in the industry, with companies that have agreed to provide signature gathering services (often as a complement to their PDM services) hiring their competitors to assist in providing all or part of the necessary labor force.

36.     Typical job listings indicate that petition circulators "must have excellent relationship-building skills, and physical stamina to gather signatures in events, public spaces, or door-to-door.  Responsibilities include, but are not limited to talking to registered voters through canvassing neighborhoods or shopping plazas. Persuade voters to sign a petition."[3]

37.     Many people are not interested in doing this sort of work because it involves repeated rejection. This limits the pool of available circulators.

38.     Although some petition drives may supplement their workforce of professional signature gatherers with volunteers, most campaigns use paid circulators, as this increases the chances of success substantially given the large number of signatures that must be gathered before the deadline.

39.     While it is possible for a petition drive to contract separately with professional signature gatherers, it is more common for the contracted PDM service provider to provide signature gathering services as well.  The PDM service provider does this with a network of individual signature gatherers

---

[3] https://www.glassdoor.com/Job/petition-circulator-jobs-SRCH_KO0,19.htm

and/or by subcontracting with companies that specialize in providing a

workforce of professional signature gatherers.

40.    As noted above, using professionals significantly enhances the

likelihood of a petition's success. Even twenty years ago, data from Oregon

highlighted this:

> [T]he big difference between volunteer-only petitions
> and paid petitioners is demonstrated by their success
> rates in qualifying for the ballot. Between 1988 and
> 2002, little better than 1 in 10 volunteer-only efforts
> made it to the ballot. Since 1996 only three volunteer-
> only initiatives have qualified for the ballot, and one of
> these, a vote-by-mail initiative, was spearheaded by
> the Secretary of State and other government officials.
> In contrast, about 40 percent of initiatives that relied
> at least partly on paid petitioners have made it to the
> ballot since 1996. Over the last four elections (1996 to
> 2002), 94 percent of the initiatives on the Oregon
> ballot have used paid petitioners.[4]

41.    The disparity between the efficacy of volunteer and paid

signature gathering efforts has only widened since then.  The National

Conference of State Legislatures explains how engaging professional

signature gatherers is now essential to successful petitions:

> Very few campaigns attempt to qualify an initiative
> petition with volunteer circulators, and even fewer do
> so successfully. Paid drives, on the other hand, are
> much more successful. A campaign that has adequate

---

[4] Richard J. Ellis, *Signature Gathering in the Initiative Process: How Democratic Is
It?*, 64 Mont. L. Rev. 35 (2003).

funds to pay circulators has a nearly 100 percent
chance of qualifying for the ballot in many states.[5]

42.     In fact, LTVD's own website strongly advises those needing to

collect signatures for a petition drive or initiative to "Work with a

professional" (that is, with LTVD) to acquire the necessary PDM services and

signature gathering services:

> DIY is great for projects around the house, but not for
> getting an issue or a candidate on the ballot. There are
> so many different nuances depending on what state or
> county you're located in, what (or who) you're trying to
> get on the ballot, and a number of other factors. Not to
> mention, there are time constraints and deadlines in
> the mix. You can't afford to waste time gathering
> signatures ineffectively. Working with a professional,
> allows you to discern exactly what needs to happen
> and when. Additionally, you get access to that
> professional's network of circulators. These are the
> men and women who get thousands of signatures from
> voters across the country.
>
> Let the Voters Decide has by far the largest network
> of circulators, located all across America. If you're
> looking for assistance getting signatures on your
> petition, there is no team more equipped to create and
> execute a winning strategy for you.[6]

43.     For these reasons, volunteers are not considered a viable

substitute for the use of professional PDM service providers or professional

signature gatherers.

---

[5] https://www.ncsl.org/research/elections-and-campaigns/laws-governing-petition-circulators.aspx

[6] https://letthevotersdecide.com/3-tips-for-getting-signatures-on-your-petition/

44.    The petition drive support industry—consisting of both providers of PDM services and providers of signature gathering services—generates highly variable revenue, which waxes and wanes with the level of political activity. For example, in 2021, just four ballot measures were conducted in the United States generating about $5 million in industry revenue.[7] In 2022, by contrast, more than $85 million was spent on 43 ballot measures across the country.[8] The variability in demand and relatively small scale of the industry has resulted in a relatively small number of firms which specialize in PDM services and in providing signature gathering services that are capable of scaling quickly.  The result has been the emergence of a limited group of influential players, like LTVD, that use networks of other industry participants and their ability to coordinate with them to expand and contract quickly in response to market conditions.  The control that these influential players have over these networks—including their ability to grant or withhold future work from other network participants—gives them market power.

45.    Defendant LTVD itself describes the signature gathering market this way:

---

[7] https://ballotpedia.org/Ballot_measure_signature_costs,_2021

[8] https://ballotpedia.org/Ballot_measure_signature_costs,_2020

> Like anything else, there is a market for signature
> gathering. If you don't understand the highs and lows,
> success can be very costly, if it is even possible.
>
> At Let the Voters Decide, we know what it takes to run
> a successful campaign. We have been helping people
> get themselves or the issues that matter most to them
> on the ballot for over 20 years.[9]

### LET THE VOTERS DECIDE

46.    LTVD provides both PDM services and signature gathering
services to ballot measure sponsors engaged in petition drives—typically but
not exclusively for Republican or right-of-center candidates or measures.

47.    On its website, LTVD claims to offer "the largest network of
professional petition circulators in the country, . . . The company collects
more than 5,000,000 signatures from registered voters from states coast to
coast. That's more signatures than any entity other than Change.org."[10]

48.    LTVD boasts about its large operation and experience:

> After over twenty years in this field, Let the Voters
> Decide has the experience to show for it. We have
> worked on countless initiatives in nearly every state.
> Qualifying an initiative has many moving parts. We
> know the number of signatures required and the time
> given to gather those signatures in each state. We also
> know that it takes manpower to gather the number of
> signatures you need. Our large amount of circulators

---

[9] https://letthevotersdecide.com/about/

[10] https://letthevotersdecide.com/nations-largest-petition-circulator-network-speaks-out/

in each state ensures that we are able to circulate your initiative effectively.[11]

49.     Mark Jacoby, the CEO of LTVD, describes himself as having "crafted a name and place for himself in the circulator industry…":

> Mark Jacoby is the owner and founder of Let The Voters Decide. He crafted a name and place for himself in the circulator industry, with over 20 years of experience in the field - working his way up from field circulator to CEO. Over time, he has developed important relationships with both clients and circulators, to whom he is deeply loyal. Mark credits his great success in the field to a young, relevant perspective combined with the lifelong experience of entering this industry at 16. His competitive yet adaptable nature has driven him to create a more pro-circulator environment, faster pay scale for his employees, and an overall more efficient business model, and has contributed to his ability to complete the sort of projects most would say are impossible.[12]

50.     Let the Voters Decide boasts having a network of 3,084 circulators nationwide[13] and claims to have "by far the largest network of circulators in the country, located all across America."[14]

51.     It regularly subcontracts work to other signature gathering firms and in other instances acts as a subcontractor for other industry

---

[11] https://letthevotersdecide.com/services/initiative-qualification/

[12] https://www.linkedin.com/in/markjacoby83/

[13] https://letthevotersdecide.com/services/initiative-qualification/

[14] https://letthevotersdecide.com/3-tips-for-getting-signatures-on-your-petition/

participants, making available a labor force of circulators drawn from its network.

52.    The circulators that LTVD boasts are not LTVD employees, but rather a network of independent contractors whom it is able to get to work on particular petition drives either by contracting with them individually or by subcontracting with other firms that contract with them individually.  Many of those circulators also work independently of LTVD's network, for other campaigns, drives, or subcontractors as opportunity presents.  Nonetheless, LTVD can and does exert substantial economic leverage over them by such tactics as threatening to exclude them from future work, withholding payments owed for prior work, or threatening to tell other companies (that themselves are subject to LTVD's economic suasion) not to work with them.

53.    In addition to providing PDM services, LTVD provides signature gathering services.  LTVD has developed a quasi-platform that matches petition circulators with PDM firms and their clients and acts as a subcontractor for other signature gathering providers, which has resulted in a substantial volume of signature gathering activity controlled by one firm in the industry.  As a result of its extensive network of circulators, LTVD is able to exercise market power within that industry—both seller market power for petition circulators as well as buyer market power (on behalf of PDM firms with respect to the amount paid to circulators).  LTVD's ability to exercise

market power was on display in 2022 when its unlawful and anticompetitive

conduct increased the price of PDM services and signature gathering services

for Secure, at least, reduced output, and lowered the quality of the services

received by Secure (in delaying its qualification for the ballot in 2022).

## THE CABAL

54.     LTVD's unlawful and anticompetitive actions were undertaken in

its capacity as the paid enforcer for a cabal of left-wing political actors—the

Sixteen Thirty Fund, Protect Michigan Vote ("Protect"), and Groundgame

Political Solutions ("Groundgame" and, collectively with Sixteen Thirty Fund

and Protect, "the Cabal").  In addition to the pay that it received from the

Cabal, LTVD benefited from its unlawful and anticompetitive actions because

they allowed it to exert dominance over other industry participants,

demonstrating and firming up its power over them in a manner calculated to

discipline members of its network and other industry participants with whom

it expects to deal in future.

55.     On its website[15] the Sixteen Thirty Fund describes itself and its

approach as follows:

> a. Sixteen Thirty Fund is a platform to help nonprofits,
> advocates, institutions, and progressive causes quickly
> and efficiently launch new projects. Interested projects
> approach  Sixteen  Thirty  Fund  and  together  they
> determine if the partnership is a good match.

---

[15] https://www.sixteenthirtyfund.org/our-approach/

b. Once Sixteen Thirty Fund becomes a project's fiscal sponsor, the project is able to quickly launch and get to work while operating under Sixteen Thirty Fund's legal and tax-exempt status.

c. Like other fiscal sponsors, Sixteen Thirty Fund is not the original source of funding for the projects it incubates. When a foundation or funder makes a donation to support a project, the fiscal sponsor receives the donation on behalf of the project. Sixteen Thirty Fund follows all local, state, and federal law with respect to the disclosure of individual donors.

d. Instead of projects setting up their own infrastructure, which is time-consuming and expensive, Sixteen Thirty Fund provides projects with a variety of administrative supports, such as legal and compliance, HR, and accounting and payroll. This streamlined model means projects can launch within weeks rather than months or even years.

e. Once a project has been incubated, the project can choose to have Sixteen Thirty Fund remain its fiscal sponsor, become its own independently operating entity, or in some cases, end its activities.

56.   The Sixteen Thirty Fund paid Protect MI Vote $2,550,000 to, at least in part, oppose Secure's efforts for sensible election law reform.

57.   Protect is "is a ballot committee opposing the Secure MI Vote petition."[16]

---

[16] https://michigandems.com/wp-content/uploads/2021/10/Decline2Sign3.pdf

58.     Throughout much or all of the period that it was interfering with Secure's petition drive, Protect had no petition of its own that it was circulating, thus Protect had no need to engage signature gathering services.

59.     Despite not needing signature gathering services, Protect had its agent Groundgame contract with multiple signature gathering services to deny their services to Secure.

60.     Groundgame is "in the business of providing general consulting services and working on state and local ballot measures nationwide."

## LTVD'S UNLAWFUL ACTIVITY

61.     LTVD successfully engaged in numerous acts of bribery and/or intimidation to foreclose Plaintiffs from access to essential PDM and signature gathering services by inducing its competitors—both providers of PDM services and signature gathering services—to refuse to work for Secure. Through this activity, LTVD reached agreements with competitors, who otherwise would have worked for Secure on its petition drive, to refuse to do so.  Each of these bilateral agreements between LTVD and a competitor had the purpose and effect of foreclosing Secure from access to necessary resources, and their cumulative impact caused Secure substantial injury.

62.     LTVD had been hired by the Cabal to act as its enforcer to prevent Secure from obtaining signatures.

63.   LTVD's actions as alleged in this complaint were motivated solely by payments that it received from the Cabal.  In a Facebook post directed to independent contractors who carried petitions for it, LTVD claimed that its actions were motivated by a belief that voter ID is inherently racist:



**Let The Voters Decide**
Mark Jacoby · 3h · 🖼

I've been saying Michigan is where it's at and it's 100% true! Not only do we have the highest board price in the history of the state, it's about to get even bigger! Our prices are all going up, as you can see!Education and Scholarship have gone up to $5, Payday has gone up to $7 and we have 3 more petitions coming out, so we will probably have around $35 on the board!

It's important to note, that no one can work our $7 payday initiative (or any of our other 3 coming out) with the SMV (Secure My Vote) initiative. That is a horrible issue being used to block minorities access to vote! You all know I have no problem with any initiative, and we'll put nearly everything on the ballot, unless it affects minorities right to vote. There is no reason that the majority should get to vote on the minority being able to vote, ever! Our other 3 issues coming out will also pay very well, so no one will feel like their missing anything. It's important for people understand that we are serious about this, so I will be putting secret shoppers out to find out if people are working our issues and this awful issue!

Yet this claim was a sham. In truth, neither LTVD nor its principal, Mark Jacoby, had any objection to voter ID measures. In fact, LTVD recruited and sent petition circulators to work on a pro-voter-ID ballot issue that appeared on the Nebraska ballot in 2022:



64.     LTVD engaged in numerous anticompetitive actions to undermine Secure's petition drive.

65.     For example, Secure initially retained National Petition Management ("National") as Secure's sole provider of both PDM and signature gathering services to meet the deadline for signatures needed for its ballot measure.  Approximately 90% of the petition circulators who made up National's labor force were members of LTVD's network.

66.     LTVD undercut National's work for Secure by, among other things, (a) forcing petition circulators within its network to stop carrying Secure's petition and (b) embedding spies at National's Michigan campaign office who reported back to LTVD information about substitute petition gatherers whom Plaintiffs hired (and in some cases had paid to import into Michigan) who were then targeted by LTVD and discouraged from continuing to work for the Secure petition drive.

67.     In the absence of LTVD's interference, National would have provided services as promised to Secure, but as a result of LTVD's interference, National did not provide the promised PDM and signature-gathering services to Secure.  To the contrary, National effectively subverted Secure's signature collection efforts because it served as a means for LTVD to identify and target signature gatherers working on the Secure campaign who

otherwise would have continued to do so but did not due to LTVD's interference.

68.    When Secure eventually recognized—in the middle of its petition drive—that continued use of National (as compromised by LTVD) was sabotaging its efforts, it was forced to cobble together a new team to play the role that National was supposed to play.  Not only did that slow down Secure's signature drive and ultimately cause it to miss the deadline for the 2022 ballot, but it also substantially increased the cost of its petition drive.

69.    LTVD also interfered with Secure's attempt to hire a signature gathering firm headed by Dustin Wefel, threatening to retaliate against him if he allowed his team of signature gatherers to work for Secure.  As a result, Mr. Wefel, who otherwise would have made his team of signature gatherers available to Secure, instead withheld them from Secure until April 2022, at which point Plaintiffs offered Mr. Wefel sufficient financial inducements to induce him to work for them despite LTVD's threats.

70.    As another example, LTVD similarly strong-armed signature-gatherer Trent Pool (who operated as a subcontractor able to provide a team of individual signature gatherers) to prevent him from working with Secure by withholding $100,000 that it owed Mr. Pool for prior work.

71.    As a result, Mr. Pool, who otherwise would have made his team of signature gatherers available to Secure, instead withheld them from Secure.

25

72.   Similarly, when Secure was able to get Steve Drattell—a signature gathering subcontractor in California—to agree to advertise the opportunity to work on Secure's campaign to his own nationwide network of signature gatherers (a network that to some extent overlapped with LTVD's network), LTVD threatened Mr. Drattell within hours and therefore he took his advertisement down.

73.   Separately, LTVD offered individuals who were independent signature gatherers payments of $2,500 to agree not to work for Secure.  It coupled that carrot with a stick: offering a bounty system of cash bonuses for anyone who could "provide proof" of a circulator who was carrying petitions for LTVD alongside any "unapproved initiatives," by which it meant any signature gatherer who was collecting signatures for Secure.  Signature gatherers in LTVD's network were threatened that if they were shown to be collecting signatures for Secure they would no longer be allowed to do any work for LTVD.

74.   LTVD invited signature gatherers to work on all ballot initiatives in Michigan except Secure's and, as noted above, threatened them if they were caught working for Secure.

75.   LTVD engaged "secret shoppers" to find out if signature gatherers collecting signatures for LTVD were also gathering signatures for Secure.

26

76.     As a result, many individual signature gatherers who otherwise would have collected signatures for Secure declined to do so.

77.     As a result of LTVD's actions—in the middle of a petition drive subject to a strict time limit—Secure was forced to abandon its original plans to use National to provide both PDM and signature gathering services and had to hurriedly hire replacement providers of both types of services.  Even here, LTVD's actions caused Secure difficulty—a number of potential PDM service and signature gathering service providers whom Secure approached reported that, although they would otherwise have been willing to work with Secure, they could not do so because LTVD had threatened to retaliate against them if they did.

78.     In the end, Secure was—albeit only with considerable difficulty and at substantial cost in terms of time, resources, and money—able to put together a team to provide the necessary services by resorting to expedients such as hiring people who had retired from the industry (and thus had nothing to fear from LTVD), expending the time and funds needed to train inexperienced personnel, and offering a substantial premium over what it otherwise would have had to spend.  Secure paid some of this increased cost itself.  Liberty, which supported Secure's signature gathering efforts, also directly bore some of these increased costs.

27

79.    Not only did LTVD's unlawful activities slow down Secure's signature gathering activities such that it was unable to meet the deadline for the 2022 election (although it did submit its signatures in an effort to qualify its ballot question for the 2024 election), but they also substantially raised the cost of Secure's petition drive.  Thus, LTVD's unlawful and anticompetitive actions increased the price paid by Plaintiffs for PDM services and signature gathering services and reduced the quality of the services provided as evidenced by the failure to meet the deadline for the 2022 election.

80.    There was no legitimate business justification for LTVD's efforts to cripple Secure's signature gathering drive by bribing, threatening, and coercing otherwise willing providers of PDM and signature gathering services—all competitors or potential competitors of LTVD—to refuse to provide their services to Secure.  Many of these competitors or potential competitors of LTVD refused to provide services to Plaintiffs contrary to their own self-interest.  Each of these entities otherwise had the economic incentive to partner with Secure MI.  It was only the unlawful actions of LTVD which led them not to do so.

81.    Secure suffered injury and damages as a result of LTVD's unlawful conduct.  The series of bilateral agreements not to work for Secure that LTVD was able to enter into with numerous competitors—both providers

28

of PDM services and providers of signature gathering services—severely foreclosed Secure's access to necessary services. As a result, not only was Secure's petition drive materially hampered, but its cost was substantially increased.

82.     Injury to Plaintiffs was the direct, foreseeable, and intended result of LTVD's conduct.

## RELEVANT MARKET

83.     Given that collecting sufficient signatures without professional assistance is unrealistic, one relevant antitrust market is the market for provision of PDM services to entities seeking to qualify ballot measures in Michigan. Consistent with the Horizontal Merger Guidelines jointly promulgated by the Federal Trade Commission and the Department of Justice, a hypothetical monopolist of such services could impose a small but significant, non-transitory increase in price above competitive levels. In the alternative, given the time limits applicable to a petition drive, the fact that suppliers of PDM services can identify the customer as Secure, the fact that resale of PDM services by one potential customer to another is not possible, and the fact that the political salience of a particular ballot question can limit the pool of available providers of PDM services, another relevant antitrust market is the market for provision of PDM services to Secure. A hypothetical

monopolist of such services could impose a small but significant, non-transitory increase in price above competitive levels.

84.    Another relevant antitrust market is the market for the provision of signature gathering services to entities seeking to qualify ballot measures in Michigan.  A hypothetical monopolist of such services could impose a small but significant, non-transitory increase in price above competitive levels.  In the alternative, given the time limits applicable to a petition drive, the fact that suppliers of signature gathering services can identify the customer as Secure, the fact that resale of signature gathering services by one potential customer to another is not possible, and the fact that the political salience of a particular ballot question can limit the pool of available providers of signature gathering services, another relevant antitrust market is the market for provision of signature gathering services to Secure.

85.    However the relevant product market is defined, the relevant geographic market is Michigan. Since signatures must be collected in person from Michigan voters, both providers of PDM services and providers of signature gathering services must focus their efforts on Michigan ballot initiatives within the State of Michigan.  That does not mean that only Michigan residents participate in that market.  To the contrary, providers of both PDM services and signature gathering services from throughout the United States provide their services within Michigan.

86.     LTVD and the competitors with whom it reached bilateral agreements to refuse Secure their services cumulatively had market power within the relevant market or markets, however defined.  Although LTVD acting by itself could not have foreclosed Secure from accessing the necessary services, the series of unlawful bilateral agreements that LTVD entered into with its competitors and potential competitors had the purpose and effect of foreclosing Secure from accessing the PDM and signature gathering services that it needed and raising the cost and decreasing the quality of those services.

87.     In addition, direct evidence exists of LTVD's own market power: if LTVD did not have market power over signature gathering services in Michigan, then its threats against entities that otherwise might have worked with Secure would have been hollow.  In other words, without sufficient market power in signature gathering services in Michigan, LTVD would have been unable to threaten its competitors into acceding to its demands.

## STRUCTURAL CHARACTERISTICS OF THE PDM INDUSTRY MADE LTVD'S ANTICOMPETITIVE CONDUCT POSSIBLE

88.     Certain inherent characteristics of the PDM industry allowed LTVD's illegal anticompetitive conduct to be successful.  As alleged above, substantial barriers to entry exist to protect LTVD's market power.  By way of example, there were no potential new entrants that might have

undermined LTVD's anticompetitive conduct within the limited time available and certainly not at anything approaching the price that would have been paid but for LTVD's anticompetitive conduct.  Mobilizing the necessary petition circulators and establishing a base of operations in Michigan would have taken time and could not have been completed before the deadline for gathering signatures for the 2022 election cycle, and the price paid in an attempt to do so was substantially inflated above the level that would have prevailed in a market unaffected by LTVD's anticompetitive conduct.

89.    The signatures needed for Secure's ballot initiative are also a commodity product.  As long as the signatures are valid, there are no quality or other differences among the signatures collected.  This made implementing and enforcing the conspiracy against Secure easier, as there were then fewer mechanisms by which members of the conspiracy could cheat: if a PDM or petition circulator were found gathering signatures on behalf of Secure, that would represent an obvious violation of the conspiracy and would be easy to punish.  LTVD's and Jacoby's own social media postings threatening retaliation against any independent contractor in his network carrying Secure's petition made this abundantly clear:



90.     Market demand for PDM services in Michigan is also likely price inelastic.  In other words, purchasers of PDM services are insensitive to price increases.  Given the absence of substitutes for PDM services in Michigan, an entity desiring to place an initiative on the Michigan ballot would have few, if any, alternatives to using PDM services in Michigan.  Even a substantial price increase in the market would be unlikely to deter such an entity from

purchasing PDM services.  Thus, to the extent that LTVD's illegal anticompetitive conduct had the effect of increasing Secure's prices for PDM services, Secure, as demonstrated by its own actions, was willing to pay those higher prices rather than foregoing PDM services.

91.     Collectively, these structural characteristics of the PDM industry gave LTVD's illegal conspiratorial activity a high probability of and, indeed, actual success.

## PLAINTIFFS' CLAIMS FOR RELIEF
### COUNT ONE
### (Violation of the Sherman Act)

92.     Plaintiffs hereby restate the foregoing paragraphs as if fully set forth herein.

93.     Each of LTVD's agreements with another provider of PDM services or signature gathering services to refuse services to Secure constituted an unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

94.     LTVD's conduct has caused injury and damage to Plaintiffs in the form of the increased costs that they incurred.

### COUNT TWO
### (Violation of the Michigan Antitrust Law)

95.     Plaintiffs hereby restate the foregoing paragraphs as if fully set forth herein.

96.     Each of LTVD's agreements with another provider of PDM services or signature gathering services to refuse services to Secure constituted an unreasonable restraint of trade in violation of the Michigan Antitrust Reform Act, MCL 445.771– MCL 445.788.

97.     LTVD's conduct constituted flagrant violations of Michigan antitrust law.

98.     LTVD's conduct has caused injury and damage to Plaintiffs in the form of the increased costs that they incurred.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray for relief and judgment against

LTVD as follows:

a. Award compensatory and trebled damages in favor of the Plaintiffs and

   against LTVD including all interest thereon;

b. Award Plaintiffs reasonable costs and expenses incurred in this action,

   including attorneys' fees and expert fees; and

c. Award any such further relief as the Court deems appropriate.


Dated: April 3, 2023                          Respectfully submitted,

                                              DHILLON LAW GROUP INC.
                                              A CALIFORNIA PROFESSIONAL CORPORATION


                                               */s/ Matthew S. Sarelson*
                                              MATHEW S. SARELSON
                                              JACOB WILLIAM ROTH
                                              1601 Forum Place, Suite 403
                                              West Palm Beach, FL 33401
                                              415.433.1700
                                              MSarelson@dhillonlaw.com
                                              JRoth@dhillonlaw.com


                                              JONATHAN M. SHAW
                                              (*pro hac vice* application
                                              forthcoming)
                                              2121 Eisenhower Avenue
                                              Suite 608
                                              Alexandria, VA 22314
                                              JShaw@dhillonlaw.com

MICHAEL A. COLUMBO
(*pro hac vice* application
forthcoming)
177 Post St., Suite 700
San Francisco, CA 94108
415.433.1700
MColumbo@dhillonlaw.com

JOSIAH CONTARINO
(*pro hac vice* application
forthcoming)
50 Park Place, Suite 1105
Newark, NJ 07102
jcontarino@dhillonlaw.com

*Attorneys for Plaintiffs*

## DEMAND FOR TRIAL BY JURY

Plaintiffs demand a trial by jury of all causes of action so triable.


Dated: April 3, 2023                    Respectfully submitted,

                                        DHILLON LAW GROUP INC.
                                        A CALIFORNIA PROFESSIONAL CORPORATION


                                        */s/ Matthew S. Sarelson*
                                        MATHEW S. SARELSON
                                        JACOB WILLIAM ROTH
                                        1601 Forum Place, Suite 403
                                        West Palm Beach, FL 33401
                                        415.433.1700
                                        MSarelson@dhillonlaw.com
                                        JRoth@dhillonlaw.com

                                        JONATHAN M. SHAW
                                        (*pro hac vice* application
                                        forthcoming)
                                        2121 Eisenhower Avenue
                                        Suite 608
                                        Alexandria, VA 22314
                                        JShaw@dhillonlaw.com

                                        MICHAEL A. COLUMBO
                                        (*pro hac vice* application
                                        forthcoming)
                                        177 Post St., Suite 700
                                        San Francisco, CA 94108
                                        415.433.1700
                                        MColumbo@dhillonlaw.com

JOSIAH CONTARINO
(*pro hac vice* application
forthcoming)
50 Park Place, Suite 1105
Newark, NJ 07102
jcontarino@dhillonlaw.com

*Attorneys for Plaintiffs*